1

2

3

4

5

6

7

**FENNEMORE CRAIG P.C.**
Shannon S. Pierce, Esq.
Nevada Bar No. 12471
Austin Slaughter
Nevada Bar No. 15645
7800 Rancharrah Parkway
Reno, NV 89511
Telephone:  (775) 788-2200
Facsimile:  (775) 786-1177
e-mail:  spierce@fennemorelaw.com

Attorneys for Defendant
*College Loan Corporation*

8

9

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JACOB BOUCON, an individual;<br><br>Plaintiff,<br><br>v.<br><br>COLLEGE LOAN CORPORATION, a Nevada Corporation; DOES I through X; and ROE Corporations XI through XX, inclusive,<br><br>Defendant. | Case No. 2:24-cv-01405-RFB-MDC<br><br>**MOTION FOR SUMMARY JUDGMENT** |

10

11

12

13

14

15

16

17

18

19

20

21

College Loan Corporation ("CLC") moves this Court for an order granting summary judgment and dismissing all claims ("Motion").  This Motion is made pursuant to Fed. R. Civ. P. 56 and Local Rule 56-1 on grounds that the claims asserted by Plaintiff Boucon fail as a matter of law (specifically, because the undisputed material facts negate one or more required elements of each of Boucon's claims).  This Motion is based on the following Memorandum, the exhibits attached hereto, the pleadings and papers on file, and any oral argument the Court may receive.

22

**MEMORANDUM OF POINTS AND AUTHORITIES**

23

**I.    INTRODUCTION**

24

25

26

27

28

This case arose after a high level executive of CLC, Boucon, submitted a letter asking for his employment to end.  CLC believed Boucon to be resigning and accepted his resignation.  That resignation came with consequences, as Boucon's employment agreement provided for severance benefits, and his phantom stock agreements provided for accelerated vesting of certain shares, only in circumstances not triggered by Boucon's resignation.  Now, Boucon attempts to rewrite history by

51777510.2/035224.0002

claiming he was fired rather than having resigned.  Even if all facts are construed in Boucon's favor, however, each of his claims fails.  Boucon admits that it was reasonable for CLC to construe his letter as a resignation, and Boucon further provided numerous admissions which contradict his claims of national origin discrimination, race discrimination, age discrimination, and retaliation.  For the reasons set forth below, Boucon's claims should be dismissed with prejudice, and judgment should be entered in favor of CLC.

## II.    CONCISE STATEMENT OF MATERIAL FACTS [PURSUANT TO LR-56-1]

### A.    College Loan Corporation, Generally

CLC is an employee-owned company that helps families plan and pay for college through educational content and resources.  **Exhibit A** (Affidavit of Nancy Ciccone), ¶2.  CLC maintains Equal Employment Opportunity ("EEO") policies which prohibit discrimination, harassment, and retaliation.  **Exhibit B** (EEO policies); **Exhibit A**, ¶3.  Periodically, CLC re-distributes its EEO policies and conducts training to provide practical, hands-on direction to employees concerning EEO matters.  **Exhibit A**, ¶3; **Exhibit C** (deposition of Plaintiff), at 145:18-20 (Boucon has reviewed CLC's anti-harassment policy).

### B.    Boucon's Rise From Credit Analyst To Chief Operating Officer

In 2003, CLC hired Boucon as a Credit Analyst.  Over the next 20 years, Boucon received numerous promotions, culminating in him being named CLC's Chief Operating Officer ("COO").  **Exhibit C**, at 17:15-11-19, 20:6-22:15.  Certain promotions are discussed below.

### C.    Boucon's Relocation To Nevada

Boucon originally worked for CLC in San Diego, California.  In or around 2009, CLC moved its operations to Nevada, and Boucon moved to Nevada as well.  **Exhibit A**, ¶4.

In connection with his 2009 move to Nevada, CLC and Boucon entered into a Relocation Letter which provided for (1) a relocation bonus equal to 30% of his Boucon's base salary, (2) a paid relocation trip with services from a real estate agent, (3) additional paid time off to be used during the relocation trip, and (4) "increased severance" of 6 months of base pay, to be paid only in the event that Boucon's employment was involuntarily terminated by CLC.  **Exhibit D**; **Exhibit C**, at 26:1-8 (authenticating same).  Boucon agrees that the purpose of the Relocation

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

2

51777510.2

1    Letter was to identify his compensation and any severance opportunity. **Exhibit C**, at 26:14-19.

2        Boucon claims that he moved to Nevada because of CLC's offer of employment and the

3    terms of the Relocation Letter. **Exhibit C**, at 25:2-10. Boucon did, in fact, remain employed

4    with CLC for more than a decade after moving to Nevada. **Exhibit A**, ¶4. Other than the

5    increased severance, discussed below, Boucon concedes that all items promised to him in the

6    Relocation Letter were provided. **Exhibit C**, at 30:9-31:12, 32:1-5. Boucon has no facts to

7    suggest that CLC did not intend, at the time that it offered the Relocation Letter to Boucon, to

8    pay the "increased severance" should it become due. **Exhibit C**, at 32:24-33:4; **Exhibit A**, ¶5 (at

9    the time it entered into the Relocation Letter, CLC intended to honor the terms therein).

10            **D.    Boucon's Employment Agreement And Subsequent Promotion**

11        In 2016, CLC's Chief Executive Officer ("CEO") John Falb ("Falb") promoted Boucon

12   to the position of Senior Vice President. **Exhibit C**, at 23:24-24:2. With this promotion, Boucon

13   and CLC entered into an Executive Employment Agreement ("EA"). **Exhibit E**; **Exhibit C**, at

14   33:7-34:2 (authenticating same). Boucon agrees that the purposes of the EA include the same

15   purposes behind the Relocation Letter, namely, establishing the compensation Boucon would

16   receive and any severance to which Boucon may be entitled (depending on the circumstances of

17   his separation from CLC). **Exhibit C**, at 34:8-18.

18        As is pertinent here, the EA provided that in the event that CLC terminated Boucon's

19   employment <u>with</u> Cause, or Boucon resigned <u>without</u> "Good Reason," Boucon would receive no

20   severance. *Id.*, §§4.2, 4.4. In the event of a termination by the Company <u>without</u> "Cause," or a

21   resignation by Boucon <u>with</u> "Good Reason," the EA provided that Boucon would receive

22   severance in the amount of (1) 12 months of base salary and (2) COBRA reimbursement for 12

23   months (collectively, "Severance"). *Id.*, §4.3. Receipt of the Severance was conditioned upon

24   Boucon signing the release of claims that was attached to his EA, through which Boucon would

25   waive and release all other claims that Boucon might claim to have against CLC. *Id.* ("If

26   Company terminates Employee's employment without Cause at any time, or Employee

27   terminates employment with the Company for Good Reason (as defined below), in consideration

28   of Employee's (1) execution of a final, complete and enforceable release, in substantially the

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

3

51777510.2

1    form attached hereto as Exhibit B…., Company shall pay Employee….")*;* **Exhibit E**, p. 17, §2

2    (the attached release waived all claims other than payment of the Severance*);* **Exhibit C**, at

3    41:24-42:5, 43:11-22 (Boucon understood that to obtain the severance promised under the EA,

4    he was required to sign not just any release, but the specific release discussed above).

5        The EA also contained an integration clause: "This Agreement, the attached

6    Confidentiality Agreement and Dispute Resolution Program Agreement constitute the entire

7    agreement of the parties and a complete merger of prior negotiations and agreements with

8    respect to the subject matter thereby addressed and…shall not be modified by word or deed,

9    except in a writing signed by the parties." **Exhibit E**, §10(e).

10       The EA was periodically amended to reflect changes to Boucon's title, increases to his

11   base salary, and to include the potential for Boucon to earn a discretionary bonus (with all other

12   terms remaining unchanged). **Exhibits F-G**; **Exhibit C**, at 45:16-24, 46:6-13, 46:20-47:7.  In

13   connection with the second amendment of the EA, Boucon was promoted to the position of

14   COO. **Exhibit C**, at 47:8-11.  Boucon was 42 years old at the time of this promotion. **Exhibit**

15   **C**, at 48:10-13.  Boucon's promotion and salary increases were approved by Falb, who is several

16   years older than Boucon. **Exhibit C**, 46:14-18, 47:21-48:2, 48:18-21, 152:8-16; **Exhibit H**, ¶2

17   (Mr. Falb was born in 1971); **Exhibit C**, at 14:13-14 (Plaintiff was born in 1977).

18                    **E.    The Phantom Stock Agreements And Plan**

19       At various points in the last few years of Boucon's employment, CLC and Boucon

20   entered into Phantom Stock Agreements ("PSAs"), through which Boucon was eligible to earn

21   cash awards tied to the price of CLC's common stock. **Exhibits I-O** (Boucon's PSAs); **Exhibit**

22   **C**, at 62:1-64:20 (authenticating same); **Exhibit A**, ¶9.

23       Boucon's PSAs referenced two categories of Phantom Stock.  For the first category,

24   time-based Phantom Stock, the PSAs required that Boucon remain employed through December

25   31 of any given year to vest in, and receive, that year's allocation of time-based Phantom Stock

26   (except in the case of a termination (by the company) without Cause or a resignation (by the

27   employee) with Good Reason, in which case, vesting would accelerate). **Exhibits I-O**, §2(a).

28       As for performance-based Phantom Stock, the determination of whether this stock vested

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

4

51777510.2

1    was left entirely in the discretion of CLC's Board of Directors, who evaluated Boucon's

2    performance in a given year to determine whether an allocation would vest.  *Id.,* §2(b) (vesting is

3    "contingent upon the Participant remaining continuously employed by the Corporation through

4    the [vesting date] <u>and</u> the Board's determination that certain performance metrics have been

5    met…") (emphasis in original); *see also* **Exhibit P** (Phantom Stock Plan), §11.7 ("The Plan

6    Administrator [which is CLC's Board of Directors] shall have full authority to determine which

7    Eligible Employees are to receive Phantom Stock awards, the time or times when those awards

8    are to be made, the number of shares of Phantom Stock…to be subject to each award, the vesting

9    schedule and/or other performance metrics relating to the vesting of the Phantom Stock,

10   and…the date or dates on which payment relating to the Phantom Stock award will be made.").

11   In the case of either time-based or performance-based Phantom Stock, if the Phantom Stock did

12   not vest, Boucon would not be entitled to receive the associated cash payout.  **Exhibits I-O**, **P**.

13              **F.    CLC's Employee Stock Ownership Program**

14              As a CLC employee, Boucon participated in CLC's Employee Stock Ownership Program

15   ("ESOP") – a Plan that is regulated by the IRS and Department of Labor.  ESOP allocations are

16   governed by the ESOP plan and trust documents, not any employee's employment agreement.

17   **Exhibit C**, at 57:4-12.  The ESOP plan year is from July 1 to June 30.  **Exhibit A**, ¶7; **Exhibit**

18   **C**, at 58:4-9.  Once an employee completes 3 years of service, he or she vest in their account

19   balance.  To receive allocations, employees must be actively employed by CLC on June 30 of a

20   given year.  **Exhibit C**, at 58:4-9, 58:18-24; **Exhibit Q** (ESOP Plan), §B.2 ("Only those who are

21   Active Participants are eligible to share in benefits that are allocated under the ESOP for that

22   Plan Year"), §B.6 ("The ESOP contribution for a Plan Year will be allocated to the Company

23   Stock Accounts and/or Other Investment accounts of those who were Active Participants during

24   the Plan Year and either: (a) are employed by the Company on the last day of the Plan Year or

25   (b) terminate employment during the Plan Year solely because of their death or normal

26   retirement or disability retirement…during that Plan Year).

27              **G.    Boucon's Departure From CLC**

28              In January 2023, Boucon gave Falb a letter asking for Boucon's employment to end.

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

51777510.2

5

**Exhibit R** (Plaintiff's January 2023 letter) ("I kindly ask you…to please terminate my employment contract without cause…."); **Exhibit C**, at 154:19-155:7 (delivery to Falb).  Prior to submitting the January 2023 letter, CLC had never taken any action to either terminate Boucon's employment or announce that his termination would occur:

> Q.  [P]rior to submitting [the January 2023 letter] to John Falb, did anyone from College Loan Corporation ever tell you that your employment was ending?
>
> A.  No.
>
> Q.  Did anyone ever say, You're fired?
>
> A.  No.
>
> Q.  Did anyone ever say before you submitted this that you were going to be fired?
>
> A.  No. []
>
> Q.  Did anyone, prior to you handing in the January letter, did anyone from the company ever ask you to resign?
>
> A.  No.

**Exhibit C**, at 86:7-17, 211:20-23; *see also id.*, at 165:25-166:8 ("I think I'd still be employed there [at CLC] if I didn't give John [Falb] this letter [the January 13, 2023 letter].").

In his letter, Boucon mentioned no complaints of alleged discrimination, harassment, or retaliation.  To the contrary, he praised the support and professionalism of both CLC and Boucon's supervisor, Chief Executive Officer ("CEO") John Falb:

> I want to start out by letting you know how grateful I am for all of the opportunities you and the senior management team have given me over the past 20 years….I can easily say [accepting employment with CLC] was **the best decision of my life**…. I feel honored to have accomplished this lifelong goal and none of this would be possible without you giving me so many opportunities….20 years have gone by in a blink of an eye and CLC has positively changed my life and my family's quality of life in countless ways….**I am forever grateful to you because of this**….**It has been a pleasure learning and growing from your leadership both as a professional and as a friend, father, husband, and confidant.  I wish you, your family, and the company nothing but the best in all future endeavors.**

*Id.*[1]

Boucon insists that, through this letter, he did not intend to resign (with or without Good

---

[1] Plaintiff also made generic reference to feeling "defeated," "disgraced," "ostracized," etc., but as evident from the face of his January 2023 letter, he did not mention any alleged harassment or discrimination in connection with these feelings.  *Id.*

51777510.2

1
2
3
4
5
6
7
8

Reason). **Exhibit C**, at 85:14-25 (twice denying having resigned). Yet he acknowledges it was reasonable for CLC to interpret the letter as a resignation. **Exhibit C**, at 160:13-21 ("Q. Can you understand as an executive for many years, that when an employee gives you a letter saying please terminate my employment, that the recipient of that letter might think that the person is resigning?...Is that something that you can conceive of?  A.  Yeah, it could be.  It could definitely be….), 161:19-21 ("Q.  Did you ever tell Mr. Falb, Please don't take this as a resignation, I'm not resigning?  A. No, I didn't use those words.").  CLC accepted what it understood to be Boucon's resignation and processed his separation effective January 19, 2023.  **Exhibit H**, ¶3.[2]

9
10
11
12
13
14
15
16
17

While Boucon's departure did not entitle him to Severance (since CLC was not initiating the termination without Cause, and since according to Boucon, he did not resign with Good Reason), given his many years of service, CLC elected to offer Boucon the Severance that he would have received if the company *had* terminated his employment without Cause.  **Exhibit H,** ¶3.  CLC then sent Boucon the release agreement that, per the EA, he needed to sign to collect Severance.  **Exhibit S**; **Exhibit C**, at 52:8-53:19 (acknowledging that CLC sent Boucon a severance agreement that was identical to the one that was attached to his EA, except that his name was filled in where a blank space had existed before, and instead of giving Boucon only 21 days to consider the agreement, CLC extended that time period to 45 days).[3]

18
19
20

Boucon, however, refused to sign the severance agreement.  **Exhibit C**, at 53:20-24.  As such, no Severance was issued, and CLC considered the matter closed.  **Exhibit E**, §4.3 (release was precondition for receipt of Severance); **Exhibit H**, ¶3.

21
22
23
24
25
26
27

[2] Boucon will likely claim that in response to his letter requesting for his employment to be terminated, CEO Falb agreed to terminate him "without cause."  While this is inaccurate, it does not create a disputed issue of fact.  To the contrary, Boucon concedes that even if this statement had been made, it would have simply been the company responding to Boucon's resignation, as opposed to the company initiating the termination.  **Exhibit C**, at 161:7-17 ("Q.  Is it possible in your mind that, when you gave Mr. Falb a letter saying, please terminate my employment, that him saying, Okay, I'll do that, was simply him responding to your request?  Is that a possibility for you?  A.  It's a possibility…").

28

[3] CLC conducted a reduction in force near in time to Boucon's resignation, so, for the avoidance of doubt, CLC gave Boucon the lengthier period of time potentially called for by the Older Workers Benefit Protection Act, 29 U.S.C. §621 *et seq*.  **Exhibit A**, ¶11.

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

7

51777510.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**H.     Plaintiff's EEOC Charge**

In November 2023, Plaintiff filed his sole EEOC charge against CLC.  **Exhibit T** (EEOC

Charge); **Exhibit C**, at 188:14-21 (authenticating same).  In this Charge, Plaintiff claimed that

for 19 days in January 2023, he was subjected to discrimination and harassment based on age

and national origin, and that he was retaliated against during this same time period.  *Id.*  Plaintiff

did not assert any allegations outside of this 19-day period.  *Id.*

**III.     LEGAL ARGUMENT**

Summary judgment should issue "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is "integral part of

the Federal Rules as a whole," not a "disfavored procedural shortcut."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 327 (1986).  Where the moving party presents evidence that calls for judgment as a matter

of law, the opposing party must show by specific facts the existence of a genuine issue for trial.  Fed.

R. Civ. P. 56(e).  This requires more than "some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus.*, 475 U.S. at 586.  Conclusory allegations are insufficient to overcome

summary judgment.  *Taylor v. List*, 880 F. 2d 1040, 1045 (9th Cir. 1989); *California Architectural

Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

**A.     Plaintiff's Claim For Breach of Contract [Count 1] Fails As a Matter of Law**

To prevail on a claim of breach of contract, Plaintiff must prove (1) the existence of a

valid contract, (2) breach by defendant, and (3) resulting damages.  *Saini v. Int'l Game Tech*, 434

F.Supp. 2d 913, 919-20 (D. Nev. 2006).  Where contract language is clear and unambiguous, the

contract must be enforced as written, and the words of the contract must be taken in their usual

and ordinary meaning.  *Am. First Fed. Credit Union v. Soro*, 131 Nev. 737, 359 P.3d 105, 106

(2015); *Dickenson v. State Dept. of Wildlife*, 110 Nev. 934, 877 P.2d 1059 (1994).

**1.     Plaintiff's Claim For Breach of the Relocation Letter Fails**

Plaintiff's claim for breach of the Relocation Letter fails for two reasons.  *First*, the

Relocation Letter, having been superseded by the EA, is no longer a valid and enforceable

agreement.  Boucon concedes that both the Relocation Letter and the EA cover the same subject

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

8

51777510.2

1   and have the same purpose: to define Boucon's compensation and potential severance. **Exhibit**

2   **C**, at 26:14-19, 34:8-18.  Therefore, the EA, containing an integration clause (**Exhibit E**,

3   §10(e)), eliminated any enforceability of the Relocation Letter.  *Quantum Energy, Inc. v. PCS*

4   *Advisors LLC*, 2:21-cv-02184-JAD-BNW, 2023 WL 362689, *6 (D. Nev. Jan. 23, 2023)

5   (recognizing that when a later agreement addresses the same subject matter as an earlier one that

6   lies "at the heart of the dispute," the later agreement supersedes the earlier one).

7         This is true for practical reasons as well.  The EA is clear that the only way that Boucon

8   could receive the Severance promised in the EA (in the event of termination without Cause or

9   resignation with Good Reason) was to sign a release of claims that waived all claims other than

10   the Severance being provided through the release.  Thus, it is impossible for the Relocation

11   Letter and EA to simultaneously exist (or, at least to provide two different sums as "severance").

12   As the EA superseded and extinguished the Relocation Letter, Boucon's claim for breach of the

13   Relocation Letter should be dismissed.

14         *Second*, Boucon's claim for breach of the Relocation Letter fails because CLC did not

15   fail to provide any contractual benefit due to Boucon.  Even if the Relocation Letter had not been

16   superseded, it provided for "increased severance" only "in the event of Involuntary Termination"

17   and in exchange for "a signed release."  As noted above, Boucon's employment indisputably

18   ended *not* because CLC initiated an involuntary termination, but rather, because CLC believed

19   that Boucon had voluntarily resigned.  Thus, no severance benefits were triggered under the

20   Relocation Letter.  Even if they were triggered, Boucon's refusal to sign the release provided by

21   CLC extinguishes this claim (see discussion of conditions precedent, below).  For all of these

22   reasons, Boucon cannot adduce evidence of a breach of the Relocation Letter by CLC, and his

23   claim should therefore be dismissed.

## 2. Plaintiff's Claim For Breach of the Employment Agreement Fails

25         Since Boucon concedes that during his employment, he received all compensation and

26   benefits due to him (**Exhibit C**, at 48:3-9), his claim for breach of the EA revolves solely around

27   his allegation that his departure from CLC triggered a right to Severance under EA §4.3.  As

28   noted above, a claim for Severance requires proof of a termination by CLC without Cause, or a

**FENNEMORE CRAIG**
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

9

1  resignation by Boucon with Good Reason.  Boucon can prove neither.

2  Boucon concedes that CLC did not initiate the termination of Boucon's employment

3  (again, either with or without Cause).  To the contrary, CLC simply processed what it understood

4  to be Boucon's resignation, and Boucon concedes that it was reasonable for CLC to have

5  understood Boucon to be resigning.  *See* §II.G, above.  Boucon therefore cannot claim

6  entitlement to Severance under the Termination without Cause standard set forth in EA §4.3.

7  Boucon also cannot claim that he is entitled to Severance under the Resignation with

8  Good Reason standard, since according to Boucon, he did not resign – either with or without

9  Good Reason.  *See* §II.G, above.  Despite Boucon's sworn testimony on the subject, however,

10  CLC anticipates that Boucon will now try to convince the Court that his January 2023 letter

11  constituted a Resignation with Good Reason.  Under EA §4.3, "Good Reason" is defined as:

12  (A) the materially adverse alteration in the nature or status of the Employee's
responsibilities or the condition of the Employee's employment from those in
13  effect on the Effective Date; (B) a material reduction by the Company in the
Employee's annual base salary, or perquisites as in effect on the Effective Date or
14  as the same may be increased from time to time except for across-the-board
perquisite reductions similarly affecting all senior executives of the Company; (C)
15  the relocation of the principal place of the Employee's employment to a location
more than 30 miles from the location of such place of employment on the date of
16  this Agreement except for required travel on the Company's business to an extent
substantially consistent with the Employee's business travel obligations on the
17  Effective Date; (D) the failure by the Company to pay the Employee any material
portion of the Employee's compensation; (E) the failure of the Company to obtain
18  a satisfactory agreement from any successor to assume and agree to perform this
Agreement; or (F) any material breach by the Company of this Agreement.

19

20  *Id.*  To resign with Good Reason, the employee must give notice of the events constituting Good

21  Reason "within a period not to exceed 90 days of the initial existence of such circumstance(s)"

22  (and then give CLC 30 days to cure such alleged circumstances).  *Id.*

23  Since Boucon's January 2023 letter references EA "Section 4.3.A," CLC anticipates that

24  Boucon may try to claim that Good Reason subsection A, concerning the material adverse

25  alteration of job duties, was triggered.[4]  Specifically, Boucon claims that in 2020 or 2021, duties

26

27  [4] Boucon could not claim Good Reason under subsections B-F of §4.3, as his pay never decreased,
he was paid all compensation he was due, he was never relocated more than 30 miles, CLC was
28  not replaced by a successor entity, and prior to submission of Boucon's January 2023 letter,
Boucon never alleged a breach of the EA by CLC.  **Exhibit C**, at 47:17-20, 48:3-9; **Exhibit A**,

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

10

51777510.2

and responsibilities were taken away from him by CLC. **Exhibit C**, at 88:13-89:4.  Even if this were true, since the alleged alteration of Boucon's job duties occurred far more than 90 days before his January 2023, according to EA's plain requirements, this cannot be a Resignation with Good Reason. **Exhibit E**, §4.3 (notice of Good Reason must be provided within 90 days of the initial existence of the alleged reduction in status or responsibility).

Finally, even if Boucon could establish either a termination by CLC without Cause, or a resignation with Good Reason, Boucon's claim of breach of contract would still fail because CLC did exactly what Boucon claims the EA required of CLC, namely, to send Boucon the release he would need to sign to receive Severance.  Boucon declined to sign the Release, which released CLC of any obligation to issue the Severance under the EA. **Exhibit C**, at 41:24-42:5, 43:5-22 (a condition precedent to receipt of Severance was Boucon's execution of the release agreement attached to his 2016 Employment Agreement).  *Shaw v. CitiMortgage, Inc.*, 201 F.Supp.3d 1222, 1250 (D. Nev. Aug. 17, 2016) (breach of contract by one party excuses the non-breaching party from performance) (internal citations omitted); *see also McCorquodale v. Holiday, Inc.*, 90 Nev. 67, 69, 518 P.2d 1097, 1098 (1974) ("A promisor's purpose in attaching a condition precedent to his promise and the legal effect in doing so is to narrow the promisor's obligation so that he will not have to perform if the event fails…").[5]  Boucon's claim fails.

### 3.  Plaintiff's Claim For Breach Of The Phantom Stock Agreements Fails

#### i.  Boucon Did Not Vest In 2023 (Or Subsequent) Time-Based Phantom Stock Awards

Boucon received all time-based Phantom Stock allocations through December 31, 2022.

¶¶6, 14-15.  To the extent Boucon tries to claim that CLC's refusal to issue new ESOP allocations or new Phantom Stock allocations after his employment ended somehow constituted Good Reason, this circular logic would fail, since these events occurred *after* Boucon's resignation and therefore could not have provided Good Reason for it.

[5] Boucon will likely claim he chose not to sign the Release because he felt he was owed more than what the Release provided.  It was certainly Boucon's choice not to sign the Release.  But that choice came with a consequence: by not signing the required Release, Boucon lost any entitlement he might otherwise claim to the Severance.  In other words, Boucon had two choices: (1) sign the Release as-is (since the EA required not just any release, but the specific release attached to the EA), and thereby receive the Severance, or (2) don't.  The Employment Agreement did not authorize Boucon to make a third choice, namely, to try to incorporate additional compensation into the Release, which had been pre-negotiated at the time of the Employment Agreement.

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA  89511
(775) 788-2200

11

51777510.2

**Exhibit U** (paystub containing 12/31/2022 phantom stock payout); **Exhibit A**, ¶13.  To be eligible for an allocation of time-based Phantom Stock for 2023, Boucon must either have been employed as of 12/31/23, or he must prove that (1) CLC terminated his employment without Cause or (2) Boucon resigned with Good Reason.  *See* §II.E, above.  It is undisputed that (1) Boucon was not employed as of December 31, 2023, and (2) no termination without Cause or resignation with Good Reason occurred.   Compl., ¶160 (Boucon left in January 2023); §III.A.2, above (lack of termination without Cause or resignation with Good Reason).  As such, Boucon's claim for time-based allocations in and after 2023 fails as matter of law and undisputed fact.

### ii.   Boucon Did Not Vest In 2023 (Or Subsequent) Performance-Based Phantom Stock Awards

Per the terms of the Phantom Stock Plan and PSAs, the determination of whether Boucon received performance-based Phantom Stock allocations was in the sole discretion of CLC's Board.  **Exhibits I-O**, §2(b)(i)-(ii); **Exhibit P**, §2.  When CLC's Board met in Q1 2023 to allocate performance-based Phantom Stock to eligible employees (based on performance during the prior year), it did not elect to grant Boucon any performance-based stock, since in the Board's discretion, Boucon's 2022 performance did not warrant it.  **Exhibit H**, ¶4.  As the PSAs grant CLC's Board this very discretion, there can be no claim for breach of contract arising out of Boucon's non-receipt of 2023 (or subsequent) performance-based Phantom Stock.

### 4.   CLC Did Not Fail To Provide Contractual ESOP Allocations

To the extent Boucon's claim for breach of contract is intended to encompass an allegation that CLC failed to grant Boucon an allocation under CLC's ESOP, this, too, would fail.  As discussed above, the ESOP is unequivocal: to receive an ESOP allocation, Boucon must remain employed through June 30.  **Exhibit C**, at 58:4-9, 58:18-24; **Exhibit Q**, §§A, B.2, B.6, B.8.  Boucon received all ESOP allocations through June 30, 2022.  **Exhibit A**, ¶7.  Since Boucon's employment ended before June 30, 2023 (**Exhibit R**), he was not eligible for an ESOP allocation at the end of the 2022-2023 Plan Year.

Boucon, of course, claims that other employees were allowed to make their resignations effective June 30th, and he should have been allowed to do so too (so as to receive an additional

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

12

51777510.2

1    ESOP distribution).  **Exhibit C**, at 74:9-20, 75:20-76:20 (Boucon identifies employees Giron,

2    Osmena, Henson, and Hodge as having been allowed to make their resignations effective June

3    30).  It is beyond dispute, however, that these employees actually requested a June 30 resignation

4    date.  Despite the fact that Boucon had seen at least some of these employees' resignation letters

5    (and therefore knew that they specifically requested a June 30 resignation), Boucon's resignation

6    letter contained no such request.  **Exhibit V**; **Exhibit R**; **Exhibit A**, ¶9.  As Boucon's

7    employment ended before the allocation eligibility date of June 30, he did not meet the criteria to

8    receive  any ESOP allocation for the Plan Year ending June 30, 2023, and CLC cannot be

9    deemed to have breached any contract as a result.

10              **B.**     **Plaintiff's Claim For Breach of the Covenant of Good Faith and Fair Dealing**
                          **[Also Count 1] Fails As a Matter of Law**

11

                         **1.**     **Plaintiff Cannot Establish The Contractual Form Of This Claim**

12

13              A breach of the implied covenant of good faith and fair dealing ("GFFD") occurs "[w]hen

14   one party performs a contract in a manner that is unfaithful to the purposes of the contract and the

15   justified expectations of the other party are thus denied."  *Hilton Hotels Corp. v. Butch Lewis*

16   *Prod., Inc.*, 107 Nev. 226, 234, 808 P.2d 919, 923 (1991).  Thus, the parties must not "do anything

17   to destroy or injure the right of the other [party] to receive the benefits of the contract" or prevent

18   or hinder the other party's ability to perform the contract."  *Id.* at 234.   "Where the terms of a

19   contract are literally complied with but one party to the contract deliberately countervenes the

20   intention and spirit of the contract, that party can incur liability for breach of the implied covenant

21   of good faith and fair dealing."  *Id.* at 232.  Conversely, where the defendant acted in conformity

22   with the contract, there can be no liability for contractual breach of GFFD.  *Srouji v. A & H Invs.*

23   *LLC*, 550 P.3d 812 (Nev. 2024), citing *State Dep't of Transp.*, 133 Nev. at 555, 402 P.3d at 683

24   (no liability for breach of GFFD where the defendant acted in conformity with the contract).

25              Here, Boucon claims that CLC *breached*, not *performed*, its obligations under the various

26   agreements at issue.  **Exhibit C**, at 73:3-14.  As such, regardless of which agreement he attempts

27   to attach it to, his claim for breach of the GFFD fails as a matter of law and should be dismissed.

28

**FENNEMORE CRAIG**
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA  89511
(775) 788-2200

51777510.2

13

### 2.   Plaintiff Cannot Establish The Tort Version Of This Claim

"[M]ere breach of an employment contract does not of itself give rise to tort damages ... [T]he kind of breach of duty that brings into play the bad faith tort arises only when there are special relationships between the tort-victim and the tort-feasor." *Mansour v. Towbin Motor Cars, LLC*, 554 P.3d 211 (Nev. 2024) (internal citation omitted).

The tort version of a claim for breach of the covenant of GFFD requires proof that (1) Boucon and CLC were parties to a contract; (2) CLC owed a duty of good faith; (3) a special element of reliance or fiduciary duty existed between the parties, where CLC was in a superior or entrusted position; (4) CLC breached the duty of good faith by engaging in "grievous and perfidious" misconduct; and (5) Boucon suffered resulting damages. *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 Nev. 346, 355, 934 P.2d 257, 263 (1997). Since it is designed to protect the "weaker" party in contractual relationships, and since, as a tort, this claim must involve "the presence of a duty created by law, not merely a duty created by contract," this claim is limited to "rare and exceptional cases" and is unavailable "where agreements have been heavily negotiated and the aggrieved party was a sophisticated businessman." *Id.; K Mart Corp. v. Ponsock*, 103 Nev. 39, 49, 732 P.2d 1364, 1370-71 (1987). Grievous and perfidious misconduct requires proof that the defendant entered into the agreement in question "with the intent to deceive." *Saticoy Bay LLC Series 10250 Sun Dusk LN v. Sunset Mesa Cmty. Ass'n*, 528 P.3d 283 (Nev. 2023).

*K Mart* was the first Nevada case to recognize a tort for breach of the covenant of good faith and fair dealing, in certain "rare and exceptional cases" involving a "special relationship" in which the employer is in a "superior or entrusted position" and commits "grievous and perfidious misconduct" against an employee. After noting that the "special relationship" is typically reserved for relationships such as the insurer-insurer relationship or other relationships "characterized by elements of public interest, adhesion and fiduciary responsibility," the *K Mart* court specifically noted that it was only finding the required element of special reliance – and the insufficiency of contractual damages, in the particular *K Mart* employment relationship because in that case, a large corporate employer had been made a specific type of promise: a promise of "continued employment" for as "long as economically possible":

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

14

51777510.2

1
2
3
4

K Mart hired [Ponsock] "until retirement" and for "as long as economically possible." … Ponsock could be released only on a determination that his performance "remain [ed] unacceptable." K Mart … released Ponsock without notifying him of any employment deficiencies…and certainly, therefore, could not possibly have based Ponsock's dismissal on a conclusion that the employee's conduct had *remained* unacceptable.

5
6
7
8
9

[W]e now recognize a bad faith discharge case in this fact-specific instance of discharge by a large, nationwide employer of an employee in bad faith for the improper motive of defeating contractual retirement benefits. [] A tort, however, requires the presence of a duty created by law, not merely a duty created by contract; … it is only in rare and exceptional cases that the duty is of such a nature as to give rise to tort liability. The … bad faith tort arises only when there are special relationships between the tort-victim and the tort-feasor as described below.

10
11
12
13
14

In this case we have a contract in which the relationship of the parties is in many ways analogous to those present in an insurance contract. Ponsock was just as dependent in "specially relying" on K Mart's commitment to his extended employment and subsequent retirement benefits as is an insurance policy holder dependent on the good faith indemnity promised by the insurance carrier. The special relationships of trust between *this* employer and *this* employee under *this* contract under *this* kind of abusive and arbitrary dismissal cries out for relief and for a remedy beyond that traditionally flowing from breach of contract.

15   103 Nev. 39, 42, 732 P.2d 1364, 1366, 1370-72; *see also Chudacoff v. Univ. Med. Ctr. of S. Nev.*,

16   2012 WL 665988, *3, fn. 4 (D. Nev. Feb. 28, 2012) ("The *K Mart* court advised parties to plead

17   such claims in an employment context thusly: 'breach of an employment contract' for the true

18   breach of contract case…'bad faith discharge,' for the cases involving breach of the implied

19   covenant of good faith and fair dealing.").

20          Here, Boucon does not assert that he had a promise of lifetime employment. Under his

21   EA, his employment could end upon notice, with certain types of separations not being

22   accompanied by Severance as discussed above. **Exhibit E**, §4. Further, in his Complaint, Boucon

23   does not assert that his separation from CLC (a local employer, not a large nationwide employer –

24   *see* **Exhibit A**, ¶2) constituted a wrongful discharge in violation of public policy. Boucon does

25   not assert this because he cannot do so: courts routinely dismiss claims of wrongful termination

26   that are predicated on alleged violations of anti-discrimination statutes, and outside of his claims

27   of discrimination, harassment, and retaliation, discussed below, Boucon does not identify any other

28   alleged public policy at issue.

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

15

51777510.2

1     Even if Boucon had alleged a claim for wrongful discharge in violation of public policy,

2   since the undisputed material facts confirm that Boucon's employment ended because CLC

3   believed he had resigned, there was no conduct by CLC that could possibly arise to a company-

4   initiated termination, much less the "grievous and perfidious" conduct required by a tort GFFD

5   claim.  Nor can Boucon – who was either a Senior Vice President or the COO (*i.e.*, key positions

6   within CLC's senior management) when entering into the agreements in question, establish any

7   special element of reliance on CLC.  *Great Am. Ins. Co.*, 113 Nev. at 355 (tort GFFD claim

8   unavailable where "the aggrieved party was a sophisticated businessman," because this contradicts

9   the requirement that the defendant be in "a superior or entrusted position").   Boucon can also

10  proffer no evidence that CLC intended to deceive Boucon in offering him the various agreements

11  at issue.  *See* **Exhibit C**, at 32:24-33:4; **Exhibit H**, ¶5.  His claim therefore fails.

12          **C.    Plaintiff's Claim Of <u>Disparate Treatment Discrimination</u> Based On <u>National Origin or Race</u> Under <u>Title VII</u> Fail As A Matter Of Law [Count 2]**

13

14                  **1.    Plaintiff's Claims Are Barred By The Doctrine Of <u>Administrative Exhaustion</u>**

15          Claims of discrimination under Title VII of the Civil Rights Act ("Title VII") and the Age

16  Discrimination in Employment Act ("ADEA") each require the plaintiff to exhaust administrative

17  remedies.  *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990) (Title VII); *Stilwell v. City of*

18  *Williams*, 831 F.3d 1234, 1244-45 (9th Cir. 2016) (ADEA); *Cabrera v. SEIU*, 2:18:CV-00304-RFB-

19  DJA, 2020 WL 2559385, at *10 (D. Nev. 2020) (dismissing for lack of administrative exhaustion).

20          To exhaust administrative remedies, the employee must file a charge of discrimination

21  within 180 days of the alleged discriminatory act.  42 U.S.C. §2000e-5(e)(1).  As the Ninth Circuit

22  has recognized, in states with workshare agreements, this deadline is extended to 300 days only

23  where the employee files the charge with the state agency (NERC) directly, or where the charge is

24  co-filed with both the EEOC and NERC.  *Scott v. Gino Morena Enterprises, LLC*, 888 F.3d 1101,

25  1106 and n. 2 (9th Cir. 2018); *Johnson v. Lucent Technologies*, 653 F.3d 1000, 1008, n. 7 (9th Cir.

26  2011); *Hayes v. NASSCO*, 695 Fed.Appx. 312 (9th Cir. Aug. 15, 2017).

27          This District has repeatedly recognized the limited application of the 300-day statute of

28  limitations.  *See Howe v. Washoe Cty. Sheriff's Office through Washoe Cty.*, No. 3:18-CV-471-

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA  89511
(775) 788-2200

16

51777510.2

1   HDM-WGC, 2019 WL 1560431, at *1 (D. Nev. Apr. 9, 2019) ("for the 300-day period to apply,

2   a plaintiff must have 'initially instituted proceedings' with NERC; if that did not happen, the 180-

3   day period applies"); *King v. Mande*, 2016 WL 3176607, at *2 (D. Nev. Apr. 25, 2016), *report*

4   *and recommendation adopted*, 2016 WL 3176572 (D. Nev. June 3, 2016); *Zakiya v. Nevada on*

5   *relation of Dep't of Health & Human Servs.*, No. 218CV00846APGPAL, 2018 WL 6182053, at

6   *2 (D. Nev. Nov. 27, 2018); *Gross v. Housing Authority of the City of Las Vegas*, No. 2:11-CV-

7   1602-JCM-CWH, 2014 WL 7014466, at *6–7 (D. Nev. Dec. 11, 2014); *Adrian v. County of Storey*,

8   2018 WL 1413383 (D. Nev. 2018).

9        Here, Boucon admits that he filed his sole Charge with the EEOC, not NERC.  He had no

10   contact with NERC whatsoever.  **Exhibit C**, at 190:19-22.  Moreover, the EEOC Charge does not

11   contain a NERC charge number or otherwise indicate that either Boucon or the EEOC co-filed the

12   Charge with NERC.  As such, Boucon was required to file his charge within 180 days of the last

13   alleged discriminatory act, or by July 2023.  Plaintiff filed his Charge several months after that

14   deadline, which is fatal to each of his statutory claims.  Plaintiff's second, third, and fourth causes

15   of action, to the extent they are predicated on Title VII or the ADEA, should be dismissed.

16        Attempting to salvage his Title VII (and ADEA) claims, Plaintiff will likely argue that he

17   considered either his initial inquiry to the EEOC, or his EEOC intake interview to constitute a

18   charge, such that his administrative exhaustion was timely.  *See Fed. Exp. Corp. v. Holowecki*, 552

19   U.S. 389, 402 (2008) (a submission to the EEOC can constitute a charge if it can be "reasonably

20   construed as a request for the agency to take remedial action to protect the employee's rights…").

21   Such an argument would not salvage Boucon's statutory claims.  Boucon's intake interview

22   contains no such request whatsoever, and his initial inquiry specifically acknowledges that Boucon

23   intended to file a charge at a later date, thus undercutting any claim that the initial inquiry

24   constitutes a charge. **Exhibit X** (intake interview); **Exhibit Y** (initial inquiry); **Exhibit C**, at 196:8-

25   13 ("Q.  And when you filled out Exhibit 22 [the initial inquiry], you understood that you would

26   ultimately need to sign what we have as Exhibit 21, which is called the Charge of Discrimination?

27   A.  Okay.  Yes, ma'am."), 188:22-189:9 (authenticating **Exhibits X-Y**).

28

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

17

51777510.2

**2.    Plaintiff Fails to Make a <u>Prima Facie</u> Case of Race or National Origin Discrimination Under Title VII**

To establish a claim of race or national origin discrimination, Plaintiff must prove (1) he is a member of a protected class, (2) he was qualified for or competently performing the position, (3) he suffered an adverse employment action, and (4) the circumstances suggest discriminatory intent. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-254 (1981).

Boucon's claim of race or national origin discrimination fails because he cannot prove the third and fourth elements, above. As discussed above, CLC did not make the affirmative decision to terminate Boucon's employment; instead, it simply accepted what it understood to be Plaintiff's resignation. See §II.G, above. This, by law, is not an adverse employment action. *See King v. AC & R Advertising*, 65 F.3d 764, 767 (9th Cir. 1995) ("'an employee cannot simply 'quit and sue,' claiming he or she was constructively discharged.'").

Since there was no adverse employment action, there also cannot be any circumstances suggesting that any such action was taken with discriminatory intent. Indeed, **even Boucon does not believe that his race or national origin contributed to his separation from CLC**. **Exhibit C**, at 163:16-166:11 (when asked why he believes his employment ended, Boucon claimed that there were three reasons, none of which had anything to do with his race or national origin). For these reasons, Plaintiff's claims should be dismissed.[6]

**3.    Plaintiff Cannot Overcome the <u>Legitimate, Non-Pretextual Reason</u> For His Separation From CLC**

If the plaintiff establishes a prima facie case, the burden of production—not persuasion—shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged

---

[6] To the extent that Boucon alleges that he suffered an adverse employment action in the form of not being granted any raises once COVID began, this would not suffice to establish a claim of discrimination. No CLC executives received raises during this time (other than routine increases given in connection with promotions), and thus, Boucon cannot identify any similarly situated individuals who received preferential treatment. **Exhibit C**, at 86:21-87:88:12; **Exhibit A**, ¶16; *McDonnell Douglas Corp.*, 411 U.S. at 802-804. These same facts also constitute a legitimate, nondiscriminatory reason for the alleged adverse action at issue. *Id.*

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

51777510.2

1   action.  *McDonnell Douglas*, 411 U.S. at 802.  The plaintiff must then show that the articulated

2   reason is pretextual "either directly by persuading the court that a discriminatory reason more

3   likely motivated the employer or indirectly by showing that the employer's proffered explanation

4   is unworthy of credence."  *Chuang v. University of California Davis*, 225 F.3d 1115, 1123 (9th

5   Cir. 2000).  The plaintiff cannot satisfy this burden with speculation or conjecture.  *Wallis v. J.R.

6   Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994)

7   (plaintiff's claim fails unless plaintiff can satisfy his burden of proof with "specific, substantial

8   evidence of pretext").

9       As discussed above, Boucon's employment ended because CLC believed he had

10  resigned.  This constitutes a legitimate, nondiscriminatory reason.  Since Plaintiff has no

11  evidence that this reason is pretextual (to the contrary, he acknowledges it is reasonable as

12  reflected in the deposition testimony quoted above), Plaintiff's claim should be dismissed.

13      **D.     Plaintiff's Claims Of <u>Harassment</u> Under <u>Title VII</u> Fail As A Matter Of Law
            [Count 2]**

14

15          **1.     Plaintiff's Hostile Work Environment Claims Are Barred By The
                Doctrine Of <u>Administrative Exhaustion</u>**

16      In addition to the fact that Boucon's entire EEOC Charge was untimely, the alleged

17  harassment that Boucon claims to have experienced falls outside the scope of Boucon's EEOC

18  Charge, and as such, Boucon's claim fails for lack of exhaustion.  When asked what comments or

19  conduct he was subjected to at CLC about his race or national origin, Boucon stated that in the year

20  that CLC moved its offices to Tivoli Village (2021), he was (1) told to buy Modelo beers for Hispanic

21  workers a couple of times and (2) issued a smaller office than other executives.  **Exhibit C**, at 149:23-

22  150:23, 180:6-14; **Exhibit A**, ¶6 (CLC moved to Tivoli Village in 2021).  Since Boucon limited the

23  scope of his EEOC Charge to alleged events occurring between January 1, 2023 and January 19, 2023

24  (**Exhibit R**), his Charge fails to exhaust administrative remedies as to alleged 2021 events.  Even if

25  Boucon's Charge could be construed to include events from 2021, since these are the sole alleged

26  events that, per Boucon, constituted harassment based on race or national origin, and since all of these

27  alleged events occurred well more than 180 days before Boucon filed his EEOC Charge, the Charge

28  is untimely as to these allegations, and Boucon's claim of harassment is barred.  *Nat'l R.R. Passenger*

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

19

51777510.2

1    *Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (Title VII "precludes recovery for discrete acts of

2    discrimination that occur outside the statutory time period" for filing claims); *see also Cherosky v.*

3    *Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003) ("discrete discriminatory acts are not actionable if

4    time barred, even when they are related to acts in timely filed charges.").

5                   **2.    Plaintiff Cannot Establish A Case Of <u>Hostile Work Environment</u>**
                    **<u>Harassment</u>**

6

7                   To state a *prima facie* case for harassment under Title VII, Plaintiff must prove that (1)

8    he was subjected to unwelcome conduct; (2) the conduct was based on race or national origin;

9    and (3) the harassment was so severe or pervasive as to alter the conditions of the plaintiff's

10   environment and create an abusive work environment.  *Kennedy v. UMC Univ. Med. Ctr.*, 203 F.

11   Supp. 3d 1100, 1106 (D. Nev. 2016); *Montero v. AGCO Corp.,* 192 F.3d 856, 860 (9th Cir.

12   1999), *citing Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986),

13   *quoting Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). "In determining whether

14   conduct is sufficiently severe or pervasive to state a claim under Title VII, courts look to 'all the

15   circumstances, including the frequency of the discriminatory conduct; its severity; whether it is

16   physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

17   interferes with an employee's work performance.' *Gonzalez v. Nevada Dep't of Corr.*, No. 2:12-

18   CV-02143-RFB, 2015 WL 4711108, at *6 (D. Nev. Aug. 6, 2015), citing *Nat'l R.R. Passenger*

19   *Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). "Conduct must

20   be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City*

21   *of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 2283 (1998).

22                  As noted above, Boucon alleges two instances that he claims constitute race or national

23   origin harassment: the alleged 2021 Modelo comments, and the 2021 assignment of a smaller

24   office.  Per Boucon, there were no other actions or comments based on his race or national

25   origin.  **Exhibit C**, at 151:20-23.  Even if these allegations were not time-barred as discussed

26   above, they are insufficient to establish a claim of harassment under Title VII.  *Kennedy*, 203 F.

27   Supp. 3d 1100, 1106 (D. Nev. 2016) (harassment must be sufficiently severe or pervasive to alter

28   the working environment); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 638 (9th Cir. 2003)

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

20

51777510.2

1    (finding that an isolated references to an employee's alleged "typical Hispanic macho attitude,"

2    did not meet the pervasive standard."); *Moore v. Donahoe*, 460 Fed. Appx. 661, 663–64 (9th Cir.

3    2011) (finding that a work assignment perceived to be less desirable was not sufficiently severe

4    or pervasive to alter the conditions of their employment).  The claim should be dismissed.

5              **E.**    **Plaintiff's Claims Of <u>Discrimination</u> And <u>Harassment</u> Under <u>The ADEA</u> Fail As A Matter Of Law [Count 3]**

6

7                    **1.**    **Plaintiff's Claims Are Barred By Administrative Exhaustion**

8              *See* Section III.C.1, above.  Such analysis applies equally to Plaintiff's ADEA claims.

9                    **2.**    **Plaintiff's Claim of <u>Disparate Treatment</u> Age Discrimination Under The ADEA Fails As A Matter of Law**

10                          **i.**    **Plaintiff Fails to Make a <u>Prima Facie</u> Case of <u>Disparate Treatment</u>**

11

12        To establish a claim of age discrimination, Plaintiff must prove his age was the "but-for"

13    cause of the employment decision.  This requires evidence that Plaintiff's age was "the reason," not

14    simply one of multiple reasons.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, (2009); *Dossat v.*

15    *Hoffmann-La Roche Inc.*, No. 2:09-CV-00245-KJD, 2011 WL 1299621, at *3 (D. Nev. Mar. 31,

16    2011) ("there is no ADEA liability for 'mixed motive' employment actions"); *Barnes v. Nat'l Council*

17    *of Juvenile & Family Court Judges, Fund, Inc.*, No. 3:10-CV-00528-ECR, 2012 WL 600827, at *6

18    (D. Nev. Feb. 22, 2012) *aff'd sub nom. Barnes v. Nat'l Council of Juvenile & Family Court Judges*,

19    548 F. App'x 405 (9th Cir. 2013) (same); *Elliott v. Fiesta Palms, LLC*, No. 2:09-CV-00740-KJD,

20    2011 WL 940742, at *3 (D. Nev. Mar. 15, 2011) (same); *Bishop v. Potter*, No. 2:08-CV-00726-RLH,

21    2010 WL 3910063, at *5 (D. Nev. Oct. 1, 2010) *aff'd sub nom. Bishop v. Donahoe*, 479 F. App'x 55

22    (9th Cir. 2012) ("Age discrimination claimants must meet an even higher 'but-for' standard, showing

23    that the employer would not have taken the adverse action but for the plaintiff's age.").

24        Additionally, to establish a prima facie case of age discrimination, Plaintiff must prove that

25    the employer hired "substantially younger" employees.  *Reeves v. Sanderson Plumbing Prods., Inc.*,

26    530 U.S. 133, 142 (2000) (*prima facie* ADEA claim requires proof that the defendant hired

27    "substantially younger" employees); *France v. Johnson*, 795 F.3d 1170, 1174 (9th Cir. 2015), *as*

28

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

51777510.2

21

1
2

*amended on reh'g* (Oct. 14, 2015) (under Ninth Circuit jurisprudence, employees who are less than ten years younger than the plaintiff are not "substantially younger").

3
4

Here, the undisputed evidence supports no reasonable inference that any decision affecting Plaintiff's employment was based, in whole or in part, on his age. This is true for two reasons.

5
6
7

*First*, Boucon was not subjected to an adverse employment action. Instead, his employment ended because CLC (quite reasonably, according to Plaintiff) believed he had resigned. **Exhibit R**; §III.C.2, above (resignation does not constitute an adverse employment action).

8
9
10
11
12
13
14
15
16
17
18
19
20
21

*Second*, there is no evidence of discriminatory animus based on age (much less that Boucon's age was the "but for" cause of any action by CLC).[7] As noted above, CLC promoted Boucon to the position of COO when he was over the age of 40. **Exhibit C**, at 48:10-15. The individual who accepted Boucon's resignation is also over the age of 40, and in fact, is older than Boucon. **Exhibit H**, ¶2. This same individual, Falb, repeatedly promoted Boucon and gave Boucon raises at a time when Boucon was over the age of 40, thus further evidencing the lack of any discriminatory intent based on age (or, for that matter, race or national origin). *Coghlan v. Am. Seafoods Co. LLC,* 413 F.3d 1090, 1094, 1098 (9th Cir.2005) (where same actor took both positive and adverse employment actions, the same actor presumption of no discrimination arises, and such presumption can only be overcome with "strong evidence of bias"); *Schechner v. KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012), citing *Coghlan* ("The same-actor inference is "a 'strong inference' that a court must take into account on a summary judgment motion."). Further at no point during his employment with CLC did anyone make any negative statements about Boucon's age. **Exhibit C**, at 152:17-153:12. In short, there is no evidence of discriminatory intent whatsoever.

22
23
24
25
26

CLC anticipates, however, that Plaintiff will attempt to establish a claim of age discrimination by pointing to those who assumed his duties after his departure (namely, Todd Transue and Sravani Atluri). According to Boucon, even before his January 2023 letter, CLC groomed these individuals to take over for Boucon. This does not create a disputed issue of fact, as even Boucon

27
28

[7] As noted below, according to Boucon's own testimony, there were numerous reasons why his employment ended, none of which concerned age. Boucon's failure to prove but-for causation is fatal to his claim. \*\*\*

**FENNEMORE CRAIG**
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

22

51777510.2

1   admits that he has nothing more than speculation to suggest that these individuals were selected to

2   take Boucon's duties based on their age. **Exhibit C**, at 182:7-183:1 (Boucon testified that it was only

3   a "possibility" that replacements were chosen based on age). Even if Boucon had something more

4   than speculation, the fact is, neither of these individuals are substantially younger than Boucon, as

5   required for a claim of age discrimination. *France*, 795 F.3d at 1174 (replacement employees must

6   be "substantially younger," meaning at least 10 years younger, and "an age difference of less than ten

7   years will be presumptively insubstantial."); **Exhibit A**, ¶12 (Transue and Atluri are each less than

8   10 years younger than Boucon); **Exhibit W**, ¶2.

9          Boucon may also assert that he was subjected to age discrimination when certain departments

10  were purportedly removed from his purview. As an initial matter, Boucon claims that this change

11  occurred in 2021, which is outside the time period of Boucon's EEOC Charge and therefore subject

12  to dismissal based on the doctrine of administrative exhaustion. **Exhibit C**, at 88:13-89:4; see

13  discussion at §III.D.1, above. Even if Boucon had exhausted his administrative remedies as to this

14  allegation, since Boucon believes that age was only one of several motives, as a matter of law, this

15  allegation cannot support a claim of age discrimination. **Exhibit C**, at 183:24-185:8 (wherein Boucon

16  lists, under oath, the numerous alleged motives for the departmental change); *Dossat*, 2011 WL

17  1299621, at *3 ("there is no ADEA liability for 'mixed motive' employment actions").

18                         ii.      **Plaintiff Cannot Overcome the <u>Legitimate, Non-Pretextual</u>**
                                    **<u>Reason</u> For The Employment Actions At Issue**
19

20         *See* Section IV.A.3, above concerning the lack of pretext as to Boucon's separation from

21  CLC. As for the alleged departmental change, while CLC never formally withdrew any

22  departments from Boucon's responsibilities, as an important compliance deadline approached in

23  2021, other CLC senior managers stepped in to help Boucon's team meet this deadline. The

24  decision to have Boucon's team members work, temporarily, with other senior managers was

25  based on the need to hit a crucial deadline, not Boucon's age (or race or national origin). This

26  constitutes a legitimate, nondiscriminatory reason for the alleged action at issue. **Exhibit W**, ¶3.

27                         3.      **Plaintiff Cannot Establish A Claim Of <u>Age Harassment</u>**

28         As noted above, Boucon concedes that any no time during his employment did anyone

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

23

51777510.2

1    make any negative comments based on his age.  *See* **Exhibit C**, at 152:17-153:12.  Since Boucon

2    was not subjected to unwelcome comments or conduct, based on age, that were so severe or

3    pervasive as to alter his working conditions and constitute a hostile work environment, Boucon's

4    claim of age harassment fails as a matter of law and should be dismissed.  *Kennedy*, 203 F. Supp.

5    3d at 1106; *Montero,* 192 F.3d at 860.

**F.    Plaintiff's Claims Of <u>Retaliation</u> Under <u>Title VII</u> And <u>The ADEA</u> Fail As A Matter Of Law [Count 2 and the Second Count Labeled As Count 3]**

**1.    Plaintiff's Claims Are Barred By Administrative Exhaustion**

*See* Section III.C.1, above.  The analysis contained therein applies equally to claims of

retaliation under both Title VII and the ADEA.

**2.    Plaintiff Fails to Make a <u>Prima Facie</u> Case of <u>Retaliation</u> Under Title VII or The ADEA**

12    Under Title VII and the ADEA, employers may not discriminate against anyone who has

13    opposed practices made unlawful by these statutes.  42 U.S.C. §2000e-3; 29 U.S.C. §623(d).  To

14    establish a prima facie case of retaliation, Plaintiff must show that (1) he engaged in protected activity;

15    (2) subsequently, an adverse employment action occurred; and (3) **but for** the protected activity, the

16    employment action would not have occurred.  *Univ of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338,

17    346-47 (2013); *Woodsford v. Friendly Ford*, No. 2:10-CV-01996-MMD, 2012 WL 2521041, at *11

18    (D. Nev. June 27, 2012) (but-for causation standard applies to ADEA retaliation claims).

19    In his Complaint, Boucon alleges that after he submitted his January 2023 letter to Falb, CLC

20    retaliated against him because the letter was the moment that he finally reduced to writing all of the

21    verbal reports he had been making to Falb, over a period of years, about alleged discrimination and

22    harassment being inflicted on other employees besides Boucon.  This allegation cannot support a

23    claim of retaliation, under either Title VII or the ADEA, for two reasons.

24    *First*, a plain reading of the January 2023 letter confirms that it contains no reference to

25    discrimination or harassment.  **Exhibit R**.  As such, the conduct that Plaintiff claims triggered his

26    separation from CLC was not, in fact, protected activity.  *Panelli v. First American Title Ins. Co.*, 704

27    F. Supp.2d 1016, 1026 (D. Nev. 2010) ("As Defendant correctly argues, Molnar fails to identify any

28    inappropriate comments, any alleged harassment or discrimination, or the identities of any alleged

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA  89511
(775) 788-2200

24

51777510.2

harassers….In sum, Molnar's veiled comments do not constitute a complaint of an allegedly unlawful employment practice. *See Garcia–Paz v. Swift Textiles,* 873 F.Supp. 547, 560 (D.Kan.1995) (noting that "employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination" and that an employee's communications to the employer must "sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner")).

*Second*, even if the January 2023 letter could be construed as protected activity, Boucon has failed to adduce undisputed evidence sufficient to meet the high "but for" standard of causation that is required to support his retaliation claims.  To the contrary, Boucon testified that his employment was "terminated" because (1) he submitted the January 2023 letter **and** (2) he knew some alleged secret information about CLC's IT processes **and** (3) for other alleged reasons unrelated to any protected activity by Boucon.  **Exhibit C**, at 163:16-166:11.  As a matter of law, this mixed-motive testimony cannot support a claim of retaliation under Title VII or the ADEA.  As even Plaintiff concedes that his alleged protected activity was not the "but for" cause of any adverse employment action, his retaliation claims must be dismissed.

### G.  Plaintiff's NRS 613 Claims Fail As A Matter Of Law [Count 2 And Both Counts Labeled As Count 3]

#### 1.  Plaintiff's Claims Are Barred By The Doctrine Of Administrative Exhaustion

As noted above, Boucon filed an EEOC charge, but he never filed a charge of discrimination with NERC (nor did the EEOC dual-file Boucon's charge with NERC).  **Exhibit C**, at 190:19-22; *see also* **Exhibit T** (Boucon's EEOC charge asserts violations of federal law, not state law and containing no mention of dual-filing).  Like its federal counterpart, NRS 613 requires a plaintiff to exhaust his administrative remedies before bringing suit.  *See Pope v. Motel 6*, 121 Nev. 307, 311, 114 P.3d 277, 280 ("However, NRS 613.420 requires an employee alleging employment discrimination to exhaust her administrative remedies by filing a complaint *with NERC* before filing a district court action.") (emphasis supplied).  In the case of NRS 613 claims, administrative exhaustion can only occur by filing a claim with NERC.  *Id.*  The EEOC, being a federal agency, does not have jurisdiction over state law claims. As Boucon failed to

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

25

51777510.2

1    exhaust his state law claims with NERC before filing suit, such claims are barred.  Indeed, this

2    District has already found that a failure to exhaust state claims with NERC requires dismissal.

3    *See Salehian v. Nevada State Treasurer's Office*, 618 F.Supp.3d 995, 1007 (D. Nev. Aug. 1,

4    2022) ("Plaintiff did not plead in her complaint that NERC had a work-sharing agreement with

5    the EEOC, that NERC waived its right to adjudicate the claim because of Plaintiff's

6    contemporaneous filing with the EEOC, or that her state law filings were presumptively

7    adjudicated by either EEOC or NERC. Consequently, Plaintiff's state law claims (within her

8    first, second, fourth, and fifth causes of action) must be dismissed without prejudice.").

9                    **2.     Plaintiff's Claims Substantively Fail As A Matter of Law**

10         Even if Plaintiff's claims were to survive scrutiny under the doctrine of administrative

11   exhaustion, substantively, they fail for the reasons set forth in §III.C-F, above.  Therefore,

12   Plaintiff's claims, to the extent they are predicated on an alleged violation of NRS 613, fail as a

13   matter of law and should be dismissed.

14         **H.     Plaintiff's Section 1981 Claims Fail As A Matter Of Law [Count 2 And The
               Second Count Labeled As Count 3][8]**

15

16                    **1.     Under Section 1981, Claims Of Disparate Treatment Discrimination
                            And Retaliation Require "But For" Causation**

17         42 U.S.C. §1981 provides that all persons in the U.S. "shall have the same right to make and

18   enforce contracts…and to the full and equal benefit of all laws and proceedings for the security of

19   persons and property as is enjoyed by white citizens…."  The U.S. Supreme Court has confirmed that

20   while claims of race discrimination under Title VII are subject to a "motivating factor" standard of

21   causation, where the same claim is pled as a violation of Section 1981, a "but for" causation standard

22   applies. *Comcast Corporation v. National Association of African-American-Owned Media*, 140 S.Ct.

23   1009 (2020) (under §1981, a plaintiff bears the "constant" burden of showing that race was the but-

24   for cause of the action at issue).  The Title VII *McDonnell Douglas* burden-shifting framework applies

25   equally to claims brought under 42 U.S.C. §1981.  *Surrell v. California Water Service Co.*, 518 F.3d

26   1097, 1105-1106 (9th Cir. 2008) (under the *McDonnell Douglas* burden shifting framework, a Title

27

28   ───────────────
     [8] Section 1981 applies only to Plaintiff's claims of race discrimination.  His claim of age
     discrimination cannot be considered under this statute.

**FENNEMORE** CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

                                                 26

51777510.2

1   VII or §1981 plaintiff must first establish a prima facie case of discrimination or retaliation).

2       As discussed at length above, each time that Plaintiff claims that he was subjected to an

3   adverse employment action, he blames multiple, mixed motives for that alleged action.  That alone

4   means that Plaintiff's Section 1981 discrimination claims, to the extent they are premised on a theory

5   of disparate treatment or retaliation, should be dismissed.

6           **2.       Plaintiff's §1981 <u>Harassment</u> Claim Fails As A Matter Of Law**

7       "A plaintiff must meet the same standards in proving a §1981 claim that he must meet in

8   establishing a ... claim under Title VII...." Namely, the plaintiff "must raise a triable issue of fact

9   as to whether (1) [he] was subjected to verbal or physical conduct because of her race, (2) the

10   conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the

11   conditions of [the plaintiff's] employment and create an abusive work environment." *Carlson v.*

12   *Partners*, No. 2:13-CV-378-JCM-PAL, 2014 WL 4798467, at *4 (D. Nev. Sept. 26, 2014), citing

13   *EEOC v. Inland Marine Indus.,* 729 F.2d 1229, 1233 n .7 (9th Cir.1984).  As discussed above, at

14   no time was Plaintiff subjected to any conduct, based on race or national origin, that arises to the

15   level of severe or pervasive conduct.  For that reason, Boucon's §1981 claim, to the extent it is

16   premised on a theory of hostile work environment harassment, fails as a matter of law.

17           **I.       Plaintiff's Claim for Luring Under False Pretenses Fails As A Matter Of Law**
             **[Count 4]**

18

19       NRS 613.010 prohibits any employer from "induc[ing]," "influenc[ing]," "persuad[ing]," or

20   "engag[ing]" any person to move into Nevada to take employment through misrepresentations

21   concerning: (a) the kind and character of the work to be done; (b) the amount and character of the

22   compensation to be paid for such work; (c) the sanitary or other conditions of their employment; or

23   (d) the existence or non-existence of a strike or other trouble pending between the employer and

24   employer and employees at the time of or prior to such engagement, proposal, or contract for such

25   employment of workers."  NRS 613.010(1).  Claims under this statute "sound in fraud" and are

26   subject to the proof requirements applicable to fraud claims.  *Woods v. Am. Fed'n of State, Cnty., &*

27   *Mun. Emps., AFL-CIO*, No. 2:23-CV-01934-RFB-DJA, 2024 WL 4349436, at *5 (D. Nev. 2024).

28       In his Complaint, Boucon states that he was lured to Nevada based on a host of alleged

**FENNEMORE** CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

51777510.2

1   misrepresentations.  Compl., ¶¶17, 20-21, 24, 27, 30.  Under oath in deposition, however, Plaintiff

2   acknowledged that he decided to move to Nevada **solely** because he was offered the chance to relocate

3   pursuant to the Relocation Letter.  **Exhibit C**, at 25:2-10 ("Q.  [W]hat made you decide to move to

4   Nevada?  A.  I was offered employment with the company that was planning to move out to Las

5   Vegas.  They offered what I felt at the time was a good relocation and employment – you know,

6   continued employment.  Q.  Any other reasons you decided to move to Nevada?  A.  No.").

7         The promises made in the Relocation Letter were true at the time they were made, and

8   Boucon concedes he has no evidence to refute that.  **Exhibit H**, ¶5; **Exhibit C**, at 32:24-33:4 ("Q.

9   Are you aware of any facts that as of then, March of 2009, the company had no intention of ever

10  paying you increased severance as reflected in [the Relocation Letter]?  A.  No, I don't think there

11  was any reason they would not want to pay.").  As such, Boucon's luring claim fails as a matter of

12  law and should be dismissed.  *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277,

13  291, 89 P.3d 1009, 1018 (2004) (claim sounding in fraud or misrepresentation requires proof of a

14  statement that was false at the time it was made).[9]

15        **J.**   **Plaintiff's Claim for Negligent Hiring, Training, & Supervision Fails [Count 5]**

16

17        **1.**   **Plaintiff's Claim Is Preempted By Statutory Remedies**

18        To challenge alleged unlawful discrimination, Nevada plaintiffs have comprehensive

19  statutory remedies available to them.  *See* NRS 613.330 (Nevada's anti-discrimination statute)

20  and the federal anti-discrimination statutes at issue in this case.  These statutory remedies

21  "provide the exclusive remedy for tort claims premised on illegal employment practices."

22

23  _____

[9]  Even if the Court were to disregard Plaintiff's deposition testimony about the sole reason he

24  moved to Nevada and focus instead on Plaintiff's allegation that he was deceived by promises of
    compliance with equal employment opportunity laws, as a matter of law, such representations are

25  not actionable under a fraud theory, as they are "corporate puffery."  *See, e.g., In re Allied Nevada
    Gold Corp.*, 2016 WL 4191017 at *7 (D. Nev. 2016) ("vague, generalized assertions of corporate

26  optimism or statements of 'mere puffing'" are not actionable as misrepresentations);
    *Intermountain Stroke Center, Inc. v. Intermountain Health Care, Inc.,* 638 Fed. Appx. 778, 795

27  (10th Cir. 2016) (company's statements of intent to comply with legal obligations are not false or
    misleading representations); *City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS

28  AG*, 752 F.3d 173, 183 (2nd 2014) ("general statements about reputation, integrity, and compliance
    with ethical norms are inactionable puffery") (internal quotations omitted).

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

28

51777510.2

1    *Brinkman v. Harrah's Operating Company, Inc.*, 2008 WL 11389180 (D. Nev. Oct. 16, 2008);

2    *D'Angelo v. Gardner*, 107 Nev. 704, 819 P.2d 206 (1991) ("no additional court-created

3    remedies…arise out of age-based wrongful discharge for which tort recovery is available by

4    statute"); *Lund v. J.C. Penney Outlet*, 911 F. Supp. 442, 445 (D. Nev. 1996) (holding that

5    employment discrimination does not constitute a tort in Nevada).

6         Applying this principle, federal courts routinely dismiss common-law negligent hiring,

7    training, and supervision claims premised on alleged unlawful employment discrimination.  *See,*

8    *e.g., Colquhoun v. BHC Montevista Hospital, Inc.*, 2010 WL 2346607 (D. Nev. 2010); *Jackson*

9    *v. Univ. Health Servs.*, 2014 WL 4635873 (D. Nev. Sep. 15, 2014) ("Plaintiff's claims based on

10   racial discrimination are clearly intended to be remedied by the statutory framework and do not

11   give rise to separate common law tort claims."); *Levy v. Mandalay Corp.*, 2015 WL 3629633, at

12   *4 (D. Nev. Jun 10, 2015) ("Plaintiff may not bring an additional common law tort claim for

13   negligent hiring, supervision, and training because the [anti-discrimination] statute precludes an

14   additional remedy for illegal employment practices"); *Hale v. Cosmopolitan of Las Vegas*, 2020

15   WL 1515327 (D. Nev. Mar. 30, 2020) (granting dismissal because "plaintiff's negligent hiring,

16   supervision, and retention claim is premised on the same facts underlying her various

17   discrimination claims").  As Plaintiff's fifth cause of action is premised on allegations of

18   discrimination, harassment, and retaliation, it is preempted and should be dismissed.  *Id.*;

19   Compl., ¶¶265-266, 268.

20                    **2.    Claims Of Negligent Hiring, Training, & Supervision Are Reserved**
                             **For Fact Patterns Not At Issue Here**

21

22        The "tort of negligent hiring imposes a general duty on the employer to conduct a

23   reasonable background check on a potential employee to ensure that the employee is fit for the

24   position." *Hall v. SSF, Inc.*, 930 P.2d 94, 98 (Nev. 1996).  "An employer breaches that duty

25   when it hires an employee even though the employer knew, or should have known, of that

26   employee's dangerous propensities."  *Id.*

27        Claims of negligent hiring and negligent retention each require proof that (1) the employer

28   knew or should have known, based on the employee's prior conduct, that employing the employee at

FENNEMORE CRAIG
ATTORNEYS                                    29
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200              51777510.2

1    issue would create an undue risk of harm to others in carrying out his employment responsibilities,

2    and (2) the employer hired or retained the employee notwithstanding this knowledge. *Romero v.*

3    *Nevada Dept. of Corrections*, 2013 WL 6206705 (D.Nev.) 17 (D.Nev., 2013); *Hall*, 112 Nev. 1384.

4            For negligent hiring and/or retention to be actionable, it must result in actual or threatened

5    physical harm caused by an employee who has previously manifested violent tendencies. *Hall*, 112

6    Nev. at 1392 ("[N]egligent hiring liability is imposed 'when the employer knew or should have known

7    that the employee was violent or aggressive and might engage in injurious conduct'"); *Staten v. Lowe's*

8    *HIW, Inc.*, 2:13-cv-00972-RCJ-CWH (D. Nev., 2013) ("this claim does not lie in Nevada based upon

9    statutorily improper discrimination, but only for physical harm."). For this reason, negligent hiring and

10   retention claims are generally reserved for cases in which the employer (a) hires a violent employee,

11   (b) places him or her in a position in which physical altercations are prone to occur, and (c) physical

12   violence thereafter is threatened or occurs. *See*, *e.g.*, *Hall*, 112 Nev. at 1392 (hiring bouncer prone to

13   violence); *Rockwell v. Sun Harbor Budget Suites*, 112 Nev. 1217, 1223, 925 P.2d 1175, 1179

14   (Nev.,1996) (hiring security guard). While negligence claims often involve questions of fact, where

15   the plaintiff has no evidence to support the elements noted above, summary judgment is proper.

16   *Romero*, 2013 WL at *17.

17           Here, Plaintiff's claim of negligence fails because he has adduced no facts suggesting that

18   any employee of CLC had a known propensity for violence that resulted in actual physical harm

19   toward Plaintiff. **Exhibit C**, at 202:1-10 (confirming the lack of any physical harm); **Exhibit A**,

20   ¶18; **Exhibit H**, ¶7; **Exhibit W**, ¶5 (no knowledge of propensity for violence); *Hall*, 112 Nev.

21   1384 (negligent hiring, training, and retention requires employer to know of dangerous

22   propensities).

23   **IV.    CONCLUSION**

24           For the above-stated reasons, CLC respectfully requests that the Court grant its Motion.

25   Dated: May 28, 2025                              **FENNEMORE CRAIG, P.C.**

26                                                         */s/ Shannon S. Pierce*
                                                          SHANNON S. PIERCE (SBN 12471)
27                                                       *Attorneys for Defendant*
                                                         *College Loan Corporation*
28

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

30

51777510.2

1

2

## INDEX OF EXHIBITS

3

| A | Affidavit of Nancy Ciccone |
|---|---|
| B | College Loan Corporation Equal Employment Opportunity Policies |
| C | Deposition of Plaintiff, pertinent portions |
| D | Relocation Letter |
| E | Boucon's Executive Employment Agreement |
| F | Amendment #1 to Boucon's Executive Employment Agreement |
| G | Amendment #2 to Boucon's Executive Employment Agreement |
| H | Affidavit of John Falb |
| I | Phantom Stock Award, dated 7/1/2016 |
| J | Phantom Stock Award, dated 3/8/2017 |
| K | Phantom Stock Award, dated 3/1/2018 |
| L | Phantom Stock Award, dated 3/1/2019 |
| M | Phantom Stock Award, dated 10/1/2020 |
| N | Phantom Stock Award, dated 4/1/2021 |
| O | Phantom Stock Award, dated 5/31/2022 |
| P | Phantom Stock Plan |
| Q | ESOP Summary Plan Description |
| R | Plaintiff's resignation letter, dated January 2023 |
| S | Email enclosing release agreement |
| T | Plaintiff's EEOC Charge, dated November 2023 |
| U | Paystub Containing 12/31/2022 Phantom Stock Payout to Boucon |
| V | Resignation Letters of Employees other than Plaintiff |
| W | Affidavit of Todd Transue |
| X | EEOC Intake Interview |
| Y | EEOC Initial Inquiry |
| Z | Shannon Pierce Affidavit |

FENNEMORE CRAIG
ATTORNEYS
7800 RANCHARRAH PKWY.
RENO, NEVADA 89511
(775) 788-2200

51777510.2